UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONNA BRANDENBURG,

    Plaintiff,

v.

MICHIGAN BOARD OF STATE
CANVASSERS, et al.,

    Defendants.
_____/

Case No. 1:22-cv-569

Hon. Hala Y. Jarbou

## OPINION

Plaintiff Donna Brandenburg brings this action against Defendants Michigan Board of State Canvassers ("BOC"); Jocelyn Benson, in her official capacity as Secretary of State; and Jonathan Brater, in his official capacity as Director of the Michigan Bureau of Elections ("BOE"). On June 22, 2022, the Court denied Plaintiff's *ex parte* request for a temporary restraining order ("TRO"). (6/22/2022 Order, ECF No. 7.) Before the Court is Plaintiff's motion for a preliminary injunction to halt the printing of primary ballots, or in the alternative, to add her name to the ballot. (ECF No. 3.) For the reasons herein, the Court will deny Plaintiff's motion.

### I. BACKGROUND

Michigan law requires candidates interested in running for the office of governor under a particular party to submit nominating petitions signed by at least 15,000 qualified and registered electors residing in the state. Mich. Comp. Laws § 168.53, § 168.544f. Plaintiff alleges that she filed nominating petitions on April 14, 2022, containing about 19,500 signatures, and on April 19, 2022, containing about 8,000 signatures by the April 19, 2022 deadline. (Verified Compl. ¶¶ 29-30, ECF No. 1.) Plaintiff used volunteer and paid circulators to collect these signatures. (*Id.* ¶ 28.)

On May 23, 2022, the BOE published its "Staff Report on Fraudulent Nominating Petitions" as well as a report directly concerning Plaintiff, titled, "Review of Nominating Petitions: Donna Brandenburg." (ECF Nos. 1-1, 1-2.) The BOE explained that during its review of nominating petitions, "staff identified 36 petition circulators who submitted fraudulent petition sheets consisting entirely of invalid signatures." (Staff Report 1, ECF No. 1-1.) These circulators provided nominating petitions in at least 10 petition drives, including Plaintiff's. (*Id.*) Staff identified these circulators as fraudulent because the petitions by these circulators "consisted entirely of invalid signatures" and the petition sheets from these circulators "tended to display at least one of" several criteria indicative of fraud. (Staff Report 2.)

After identifying these circulators, the BOE "conducted a targeted signature check of signatures across each circulator's sheets for each candidate to confirm that these circulators' submissions in fact consisted of fraudulent sheets with invalid signatures." (*Id.* at 4-5.) One common indicator of fraud that staff noticed was "the signatures, names, addresses, and dates on many of the fraudulent sheets were obviously signed by one or a small number of individuals." (*Id.* at 5.) The BOE then cross-checked at least 6,876 signatures within the petition sheets of these fraudulent circulators with the Qualified Voter File ("QVF") to further double check the authenticity of the signatures. (Brater Aff. ¶ 47, ECF No. 1-3.) For Plaintiff's petition, staff cross-checked the QVF for 1,014 of the 11,144 signatures (9.1%) submitted by fraudulent petition circulators. (*Id.*) In doing so, staff did not identify a single valid registered voter with a matching signature. (*Id.*)

Disqualifying the fraudulent signatures caused many of these candidates, including Plaintiff, to fall below the required threshold for valid signatures. On May 26, 2022, the BOC held a hearing to review the BOE's recommendation. The four members of the BOC voted on whether

2

to uphold the BOE's recommendation and deadlocked two to two. This meant that the affected candidates would not appear on the ballot.

Plaintiff alleges that the Staff Report is the first time she was alerted to the issues of fraudulent signatures in her nominating petitions prior to the May 26 hearing. Whereas the other disqualified candidates received notice by April 26 due to third-party challenges to the sufficiency of their petitions, there were no challenges to Plaintiff's petitions by April 26. Plaintiff also alleges that the BOC held a hearing earlier on May 2 to review the process used to verify signatures after third-party challenges were filed and responded to by the other candidates. Plaintiff was not present at this hearing because she was not subject to any third-party challenge.

Further, Plaintiff alleges that the report specific to her erroneously identified only 17,778 total signatures, though she had submitted approximately 27,500. Of the 17,778 identified signatures, the report found that 11,144 were submitted by fraudulent petition circulators. (Brandenburg Review 1, ECF No. 1-2.) That left Plaintiff with only 6,634 facially valid signatures, far short of the required 15,000. (*Id.*) Plaintiff claims that the issue of the missing signatures was raised to the BOC at the May 26 hearing, but the BOC did not consider or resolve the issue.

Because Plaintiff raised this issue at the hearing, on June 2, 2022, the BOE located the supplemental filing of petitions that Plaintiff delivered on April 19, which consisted of 6,198 additional signatures. (Brater Aff. ¶¶ 101-103.) After BOE staff reviewed the additional signatures, the staff determined that 2,894 signatures had been submitted by the same fraudulent petition circulators identified in the Staff Report. (*Id.* ¶ 108.) The staff did not perform a face review of the remaining petitions, but concluded that, assuming they were facially valid, this would leave Plaintiff with only 9,938 valid signatures. (*Id.* ¶ 107.) Staff performed a supplemental check in the QVF of 171 (5.9 %) of these signatures, none of which were valid. (*Id.* ¶ 110.)

3

Plaintiff filed suit in the Michigan Supreme Court for mandamus relief on June 2, 2022, which was rejected on June 7, 2022. (ECF No. 5-1.) Plaintiff subsequently filed suit in this Court on June 21, 2022.

## II. STANDARD

A preliminary injunction "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). The Court considers four factors when deciding whether to grant a preliminary injunction:

(1) whether the movant has a "strong" likelihood of success on the merits;

(2) whether the movant would otherwise suffer irreparable injury;

(3) whether issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

"These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). However, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

## III. ANALYSIS

### A. Likelihood of Success

#### 1. Plaintiff's Arguments

Plaintiff contends that Defendants violated her constitutional rights under the First and Fourteenth Amendments. Plaintiff primarily argues that her constitutional rights were violated

4

because: (1) Defendants failed to consider all signatures submitted in support of her nomination, (2) Defendants had no authority to challenge the authenticity of the signatures in her nominating petitions without a third-party sworn complaint, (3) Defendants disqualified her nominating petitions without individually checking each signature with the QVF, and (4) the BOC's deadlock should be a determination that the signatures are presumed valid. (Pl.'s Br. in Supp. of Verified Compl. 10-30, ECF No. 5.)

The Court notes that Plaintiff fails to substantively address all the factors necessary for a TRO or preliminary injunction in her motion and briefing. Instead, Plaintiff directs the Court to her Verified Complaint which is inexplicably accompanied by a "Brief in Support of Plaintiff's Verified Complaint." (ECF No. 5.) While this separate brief contains substantive arguments not included elsewhere, it also does not directly address the factors necessary for a TRO or preliminary injunction. Furthermore, Plaintiff does not explain how Defendants' alleged actions violated her constitutional rights. Plaintiff has the burden of persuasion, and the Court will not make Plaintiff's arguments for her. Still, the Court will address Plaintiff's arguments, which nevertheless, are not sufficient to carry her burden.

To state a due process claim, Plaintiff must identify a cognizable liberty or property interest. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). She provides no argument or precedent supporting such an interest. Indeed, Supreme Court precedent suggests that a right to candidacy is not a cognizable liberty interest protected by procedural due process. *See Snowden v. Hughes*, 321 U.S. 1, 7 (1944) (reaffirming the determination that "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause"); *see also Bullock v. Carter*, 405 U.S. 134, 142-43 (1972) ("[T]he Court

5

has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review.").

Plaintiff asserts that the BOC did not address the BOE's failure to count all her nominating petitions prior to the May 26 hearing. Plaintiff claims that this, and the BOE's subsequent treatment of the supplemental petitions, are violations of "substantive and procedural due process and a violation of the separation of powers clause." (Pl.'s Br. in Supp. of Verified Compl. 12.) Plaintiff provides no support or explanation for how these constitutional rights were violated.

Director Brater's affidavit details how the supplemental petitions were later discovered and examined. There were 6,198 additional signatures, but the BOE staff determined that 2,894 signatures had been submitted by the same fraudulent petition circulators identified in the Staff Report. (Brater Aff. ¶¶ 101-08.) Even if the remaining signatures were facially valid, Plaintiff would remain below the required threshold. The procedures used with the supplemental filings were the same as those used to make the initial determinations, that is, disqualifying signatures submitted by the identified fraudulent petition circulators. The issue of the fraudulent petition circulators was before the BOC during the May 26 hearing. If the BOC erred in failing to address the supplemental petitions, the error was harmless. Even if the BOE had counted the supplemental petitions in the first round, her petition would still be insufficient. Plaintiff does not explain how the result would have been different or how this error constitutes a constitutional violation.

Plaintiff's argument that the BOE may not challenge the authenticity of the signatures in her nominating petitions without a sworn complaint from a third-party is meritless. Michigan law states that "Upon the receipt of the nominating petitions, the board of state canvassers shall canvass the petitions to ascertain if the petitions have been signed by the requisite number of qualified and registered electors." Mich. Comp. Laws § 168.552(8).

6

> If the board of state canvassers receives a sworn complaint, in writing, questioning the registration of or the genuineness of the signature of the circulator or of a person signing a nominating petition filed with the secretary of state, the board of state canvassers shall commence an investigation.

*Id.* Indeed, § 168.552(9) adds that the BOC may "conduct an investigation of the petitions" "for a purpose considered necessary by the board of state canvassers." *Id.* at § 168.552(9). A plain reading of the statute makes it clear that it is the duty of the BOC to assess the petitions and confirm that they are signed by qualified and registered electors. The statute states that the BOC is required to commence an investigation if they receive a sworn written complaint but does not state that the BOC can *only* commence an investigation if they receive a complaint.

Plaintiff points to *Deleeuw v. State Board of Canvassers* to make that argument. There, the Michigan Court of Appeals wrote:

> . . . . because the challenge to the petition failed to establish that there were not at least thirty thousand valid signatures filed in support, the board breached its clear legal duty to certify the petition. **See M.C.L. § 168.552(8), which allows the board to investigate only** if the board "receives a sworn complaint, in writing, questioning the *registration of* or the *genuineness of* the signature of the circulator or of a person signing a [qualifying] petition. . . ." (Emphasis added.)

*Deleeuw v. State Bd. of Canvassers*, 688 N.W.2d 847, 851 (Mich. Ct. App. 2004) (bolding added). Plaintiff hangs her hat on the bolded words in the citation. However, the court in *Deleeuw* was not making a finding on Plaintiff's point. The court stressed that "The Board of State Canvassers' sole duty with regard to qualifying petitions is to determine whether the signatures on the petition are valid, including that of the person who circulates the petition, whether they are the signatures of registered voters, and whether they are sufficient valid signatures to certify the petition." *Id.* at 849. The court found that the BOC had exceeded its authority when considering challenges based on various violations of election law unrelated to that sole duty. There was no dispute about the validity of the signatures in *Deleeuw*, and the Secretary of State had determined that there was a sufficient number of facially valid signatures. *Id.* at 849-50. Therefore, the court found that "the

7

board breached its clear legal duty to certify the petition," emphasizing the board's duty relating to the "registration of" and "genuineness of" the signatures. *Id.* at 851. Because the court in *Deleeuw* did not hold that the BOC can carry out its "sole duty" only in the presence of a sworn complaint from a third-party, this Court is not persuaded by Plaintiff's argument.

The argument that every signature must be compared to the QVF to properly assess its genuineness has already been discussed and dismissed by the Michigan Court of Appeals. *Johnson v. Bd. of State Canvassers*, No. 361564, 2022 WL 1787359, at *8 (Mich. Ct. App. June 1, 2022) (hereinafter *Johnson I*). Fellow disqualified gubernatorial candidate Perry Johnson filed for mandamus in state court and argued that "the Board had a clear, legal duty to check each and every signature against the qualified voter file before it could deem the signature invalid." *Id.* But the court pointed to § 168.544c, which forbids individuals from signing a petition with a name other than his or her own or with multiple names. Mich. Comp. Laws § 168.544c(8), (10). Additionally, § 168.544c(11) provides:

> (11) If after a canvass and a hearing on a petition under section 476 or 552 the board of state canvassers determines that an individual has knowingly and intentionally failed to comply with subsection (8) or (10), the board of state canvassers may impose 1 or more of the following sanctions:
>
> *(a) Disqualify obviously fraudulent signatures on a petition form on which the violation of subsection (8) or (10) occurred, without checking the signatures against local registration records.*
>
> (b) Disqualify from the ballot a candidate who committed, aided or abetted, or knowingly allowed the violation of subsection (8) or (10) on a petition to nominate that candidate.

Mich. Comp. Laws § 168.544c(11) (Emphasis added). Because "the Board determined that several individuals—the fraudulent-petition circulators—knowingly and intentionally failed to comply with MCL 168.544c(8) and (10)," the court held that "the Board had the discretion to disqualify their obviously fraudulent signatures without checking the signatures against local registration."

8

*Johnson I*, 2022 WL 1787359, at *8.  Plaintiff contends that there is a difference between the local registration records mentioned in § 168.544c(11)(a) and the QVF, which is not mentioned. However, the state court did not make this distinction, holding that "The Board, therefore, had a clear legal duty to investigate, but it did not have a clear legal duty to conduct a comparison of each fraudulent signature against the qualified voter file."  *Johnson I*, 2022 WL 1787359, at *8. Thus, the state court has determined that the BOE and BOC processes did not violate state law.

Plaintiff argues that the BOC deadlock at the May 26 hearing is a determination that the signatures are presumed valid.  Plaintiff points again to *Deleeuw* in support, but the language in that opinion provides no assistance.  The court was interpreting what constitutes "a determination made by the board of state canvassers" within the meaning of Mich. Comp. Laws § 168.552(12). *Id.* ("A person who has filed a nominating petition with the secretary of state and who feels aggrieved by a determination made by the board of state canvassers may have the determination reviewed by mandamus, certiorari, or other appropriate process in the supreme court.").  The BOC had deadlocked in that instance as well, and the court held that a deadlock was "a determination" within the meaning of the statute, stating, "The board's inaction, through its deadlock, in our view constitutes an action, which is the equivalent of a determination." *Deleeuw*, 688 N.W.2d at 853 n.4.  This language does not support Plaintiff's contention that a deadlock indicates that her nominating petitions are presumed valid, merely that it is a determination that may be reviewed in state court.  The BOC's deadlock meant that Plaintiff's petition was not declared sufficient, and therefore the Secretary of State could not certify her inclusion in the slate of primary candidates. (*See* 5/26/2022 Bd. of State Canvassers Tr. 180-85, 192, ECF No.17); *Johnson v. Mich. Bd. of State Canvassers*, No. 22-11232, 2022 WL 2116091, at *4 (E.D. Mich. June 13, 2022) (hereinafter

*Johnson II*). Plaintiff provides no other support for her argument that a deadlock is a determination in her favor.

The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. *See Shefke as N/F of Doe v. Macomb Intermediate Sch. Dist.*, No. 20-cv-10049, 2020 WL 4816202, at *5 (E.D. Mich. Aug. 19, 2020) ("The decision whether to exercise supplemental jurisdiction over a claim is purely discretionary and depends on judicial economy, convenience, fairness, and comity." (citing *Carlsbad Tech., Inc. v. HIF Bio., Inc.*, 556 U.S. 635, 639 (2009)); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996)). Plaintiff alleges violations of Michigan's constitution, which is more suitably addressed by the state courts. *See* 28 U.S.C. § 1367(c)(1).

### 2. Doctrine of Laches

Plaintiff has failed to make a showing that her constitutional rights have been violated, but even if Plaintiff's rights were violated, the defense of laches bars Plaintiff's claims. "Laches is the negligent and unintentional failure to protect one's rights." *Cunningham v. Interlake S.S. Co.*, 567 F.3d 758, 761 (6th Cir. 2009) (internal citations and quotation marks omitted). Laches is an equitable doctrine rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160 (6th Cir. 1941). "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *See, e.g.*, *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002); *McKeon Prods., Inc. v. Howard S. Leight & Assocs.*, 15 F.4th 736, 742 (6th Cir. 2021). The burden then shifts to the non-asserting party to prove excusable delay and lack of prejudice to the asserting party. *Cunningham*, 567 F.3d at 762.

**(a) Plaintiff's Delay**

Defendants argue that Plaintiff delayed unreasonably in filing this action on June 21, 2022. Election procedures operate on tight deadlines. Accepting May 23, the day the Staff Report was published, as the earliest date that Plaintiff received notice of the issues with her nominating petitions, Plaintiff does not explain why she waited until June 21 to file in this Court. Plaintiff knew as of the May 26 hearing that her name would not be on the ballot. Yet, Plaintiff did not file suit in the Michigan Supreme Court until June 2, one day before the Secretary of State was required to certify the slate of candidates to the counties. As Defendants argue, there is no reason why Plaintiff could not simultaneously file in federal court. And by June 21, the June 16 deadline for counties to deliver absent voter ballots to the county clerk and the June 18 deadline for county clerks to deliver absent voter ballots to the township and city clerks had already passed. *See* Mich. Comp. Laws § 168.713-14. Further, Plaintiff did not serve Defendants until June 24 (Defs.' Br. in Opp'n 20, ECF No. 15), after the Court denied Plaintiff's motion for *ex parte* relief. (*See* 6/22/2022 Order.)

The Court further notes the decision in Perry Johnson's motion for TRO and/or preliminary injunction filed in federal court. *See Johnson II*, 2022 WL 2116091. Johnson commenced his action on June 6, after his suit was rejected in state court, but prior to the printing of ballots. Yet, the federal court there found that the doctrine of laches precluded Johnson's suit. *Johnson II*, 2022 WL 2116091, at *5.

Plaintiff argues that her case differs from the other disqualified gubernatorial candidates because there were no third-party complaints filed against her nominating petitions by April 26, 2022. The Court is not persuaded that this explains or justifies the delays in commencing this action, given both the tight deadlines and Plaintiff's knowledge after the May 26th hearing that

11

her name would not be on the ballot. Plaintiff provides no explanation for her nearly one-month delay in filing in this Court after that hearing.

### (b) Prejudice to Defendants

As mentioned above, the primary will take place in August of 2022. The Secretary of State has already certified the slate of candidates, and counties began the ballot proofing and printing process right after. (Brater Aff. ¶ 112-22.) This process includes printing primary ballots in approximately 5,000 different ballot styles. *See* Mich. Comp. Laws § 168.563; (Defs.' Br. in Opp'n 21). As of June 16, the county boards have delivered absent voter ballots to county clerks who delivered the ballots to the township and city clerks by June 18. Mich. Comp. Laws § 168.713-14. Additionally, municipal clerks have already sent absent voter ballots to military and overseas voters. (Brater Aff. ¶ 123.) While Plaintiff filed on June 21, she did not serve Defendants until June 24, and as of June 28, 2022, at least 600,000 ballots have already been printed and sent out to voters. (*Id.*) Defendants represent that Plaintiff's requested relief would require starting the proofing and printing process again, which would be disruptive and costly, potentially resulting in voters not receiving ballots by the constitutionally and statutorily required deadlines. (*Id.* ¶ 124.) Paper shortages could further delay or prevent the reprinting of ballots. (*Id.* ¶ 126.) The court in *Johnson* recognized the prejudice to Defendants even when Johnson requested similar relief two weeks before Plaintiff did. *Johnson II*, 2022 WL 2116091, at *6.

Therefore, Defendants have established that Plaintiff delayed unreasonably in asserting her rights and have established the prejudice resulting from this delay. If Johnson "pushed the timeline to the brink" by filing on June 6, Plaintiff has pushed it over the edge. *Id.* The doctrine of laches undermines the likelihood of success on her claims.

**B. Irreparable Harm**

Plaintiff presents three ways in which she will suffer irreparable harm: (1) Michigan Primary Ballots will be printed and distributed to all election clerks without her name; (2) Defendants have denied her access to the records of other candidates which impairs her ability to investigate the reasons behind her exclusion from the ballot in order to ensure due process and equal application; and (3) materials will be destroyed that would help to understand the process by which BOE staff evaluated the nominating petitions.  (Pl.'s Br. in Supp. of Mot. for TRO, ECF No. 4, PageID.223.)

Plaintiff may suffer irreparable harm if she were unconstitutionally deprived of access to the ballot, but she has not shown that her constitutional rights have been violated.  Plaintiff provides no argument for her second reason, that the denial of access to records would constitute irreparable harm such that a preliminary injunction should issue.  As to Plaintiff's third reason, she has not alleged any facts in her verified complaint or affidavit to support her claim that BOE staff are destroying materials related to the evaluation of the nomination petitions.  This factor does not weigh in Plaintiff's favor.

**C. Harm to Others and Public Interest**

The third and fourth factors overlap in this case.  As discussed above, Plaintiff's requested relief would prejudice not only Defendants, but third parties as well, including the counties and clerks who have worked on proofing, printing, and delivering hundreds of thousands of ballots, and the voters who have already received ballots.  Further, the State has a strong interest in the enforcement of its election laws and deadlines.  *See Nader v. Blackwell*, 230 F.3d 833, 835 (6th Cir. 2000) ("A state's interest in proceeding with an election increases as time passes, decisions are made, and money is spent.").  The public interest in a timely and orderly election process weighs against Plaintiff.

## IV. CONCLUSION

For the reasons stated, the Court will deny Plaintiff's motion for a temporary restraining order and/or preliminary injunction. An order will enter consistent with this Opinion.

Dated: July 7, 2022          /s/ Hala Y. Jarbou
                             HALA Y. JARBOU
                             UNITED STATES DISTRICT JUDGE